EXHIBIT 1

TO

VERIFIED COMPLAINT *IN REM*

DECLARATION OF WALTER W. BRIGHTMAN

# DECLARATION OF WALTER W. BRIGHTMAN

# IN SUPPORT OF COMPLAINT

I, Walter W. Brightman, provide the following information under the penalty of perjury, as provided by 28 U.S.C. § 1746, and declare that the following is true and correct to the best of my knowledge, information and belief.

**A.      Declarant's Background**

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") assigned to Nashville, Tennessee.  I was hired by the DEA in August of 2020 before graduating from the academy in December of 2020 and becoming a Special Agent.  Prior to DEA, I worked for the Gulfport Police Department in Mississippi for 16 and a half years and was a police officer for 12 and a half years.  The federal crimes I am assigned to investigate include but are not limited to violations of 21 U.S.C. §§ 841 and 846 (drug trafficking) and 18 U.S.C. §§ 1956 & 1957 (money laundering).

**B.      Items Sought for Forfeiture**

2.      Pursuant to 21 U.S.C. § 881(a)(6), the United States seeks the forfeiture of $29,810 United States currency ("Defendant Property").

**C.      Basis of Information**

3.      The information in this Declarant was obtained through my personal observations, training and experience, information gathered during interviews of and conversations with civilians and other law enforcement officers, and written reports and investigations conducted by other law enforcement officers. I have not included every item of information known to me concerning the Defendant Property and the facts surrounding this Declaration, but only those relevant to a determination that the Defendant Property is subject to forfeiture.

D.  **Facts**

*Initial Encounter with Tashia Foster and Discovery of the Defendant Property*

4. On Tuesday, August 23, 2022, at approximately 3:45 p.m., Metropolitan Nashville Airport Authority ("MNAA") Police Officers were notified by TSA Agents that a large sum of United States currency ("U.S. currency") was discovered at the security checkpoint in the carry-on luggage of Southwest Airlines passenger, Tashia Diane Foster ("Foster"), who was scheduled to depart at 7:05 p.m. from Nashville, TN to San Francisco, CA, with a layover in Denver, CO.

5. The U.S. currency was discovered in a green Crown Royal bag located inside of Foster's carry-on luggage. The U.S. currency was rubber-banded in what appeared to be $1,000 increments. The small stacks were subsequently rubber-banded in three larger stacks of approximately ten bundles each.

6. MNAA Police Officers Daniel De Pinto ("Officer De Pinto") and Austin Hoffmann ("Officer Hoffman") arrived at the south TSA Checkpoint. Upon observing the U.S. currency, Officer De Pinto asked Foster if she would be willing to accompany the officers to a nearby office to discuss the U.S. currency outside of public view. Foster agreed.

7. Upon arriving at the law enforcement office, Officer De Pinto informed Foster that she was not being detained or under arrest and was free to leave at any time. Foster stated that she understood. Shortly thereafter, MNAA Detectives Brad Kessler ("Detective Kessler") and Chris Swisher ("Detective Swisher"). Detective Kessler reiterated to Foster that she was not in trouble or being detained.

*Foster's Initial Explanation*

8. Foster stated the following:

    a. Foster quit working as a nurse and started a trucking company called Outlandish Trucking, LLC to make better money.

3

      b.      Foster was going to Tijuana to receive a medical procedure and intended to pay for the procedure with the money, which was approximately $20,000.00 to $30,000.00.

      c.      Foster planned on being in Tijuana for approximately one week.

      d.      Foster had purchased her ticket last minute due to trying to locate a doctor for her surgery.

9. Foster could not provide Department of Transportation ("DOT") information on Outlandish Trucking, LLC. Foster could not provide information as to the type of loads she would transport, length of trailer, or driving routes.

10. A database query of Foster's telephone number *7438 revealed the number had been at one time in contact with a known marijuana and methamphetamine trafficker in Nashville, Tennessee, and was associated with an investigation in Tucson, Arizona.

### *Foster's Response to DEA Questioning*

11. MNAA police officers contacted Drug Enforcement Administration ("DEA") Nashville Task Force Group 2 investigators. At approximately 4:30 p.m., DEA Special Agent Mark Gonzalez ("SA Gonzalez") and I arrived at the law enforcement office located on the D Concourse.

12. I introduced and identified myself to Foster. At that time, I was unfamiliar with Foster's story and asked her if she would repeat the story that she gave to the officers earlier. Foster stated the following:

      a.      Foster drove from Ohio to Nashville and arrived at approximately 12:30 a.m. and met a friend she only wanted to describe as "Keith". Keith was a married man and Foster did not wish to involve him or wish to give any other information about him.

      b.      Foster had driven back and forth between Ohio and Nashville several times in the last few days.

      c.      Foster had two jobs, both in Home Health Care. Foster stated that one of the jobs was with Trinity Health Care and the other job was with Divine Health Care.

d. Foster saw, on average, approximately four patients a week. The time she spent with each patient varied and because of the varying work hours, she was able to make the 5-hour drive from Ohio several times.

e. Foster and Keith would meet somewhere in the middle, between where they both lived, during these drives.

f. Foster arrived in Nashville and checked in at the Holiday Inn at 12:30 a.m.

g. After she arrived in Nashville, she purchased a flight to Atlanta, Georgia.

h. Foster had plans to go to Mexico with her friend "Nikki".

i. Foster planned to use the money she had for medical procedures.

j. The procedure should cost between $25,000 to $26,000.

k. Foster had gone to Mexico and/or out of the country approximately four to five times for a medical operation.

l. Foster stated she goes out to the country because the medical costs are "way cheaper".

m. Foster made approximately $100,000.00 and stated she has not filed taxes in two years.

n. Foster saved the United States currency over time.

***Drug Dog Alert to the Defendant Property***

13. At approximately 4:35 p.m., DEA Task Force Officer Matt Moore ("TFO Moore") arrived on scene. TFO Moore informed Foster that investigators were going to run a trained K-9 on the U.S. currency to determine if the money had been around narcotics.

14. Foster stated she did not do drugs and has not been around any narcotics.

15. At approximately 4:38 p.m., Detective Swisher placed the United States currency in a controlled environment in an array of boxes. Detective Swisher introduced K-9 "Peggy" to the array of boxes, and Peggy gave a positive alert for the odor of narcotics on the box that contained the U.S. currency.

### *Consent Search of Foster's Car*

16. After Foster explained that she had driven herself to the Nashville Airport, investigators asked for consent to search her vehicle. Foster consented and handed her vehicle's keys to investigators and explained which parking garage and where she parked.

17. Investigators then located and searched Foster's vehicle and discovered approximately 9 grams of marijuana, and investigators located several receipts.

18. After investigators returned from the vehicle search and got back to the office, Foster's vehicle keys were returned.

### *Foster's Story Evolves*

19. Investigators familiar with Foster's first story (driving straight to Nashville to meet Keith and fly out of the airport) asked Foster if she went anywhere else in Tennessee. Foster said no she did not go anywhere else.

20. Detective Kessler informed Foster that a receipt was found in her vehicle from August 22, 2022, where she purchased items in Memphis. Foster then provided the following:

   a. Foster drove to Memphis to go to a Motorcycle Cabaret party. Foster went there with Keith on his motorcycle.

   b. When the inconsistency was pointed out to Foster in her two different stories, Foster explained that she actually drove down from Ohio the previous day and only parked her vehicle at the Holiday Inn, she did not get a room.

   c. Foster rented a room in Memphis but did not stay the night and the room was only used as a hangout location.

   d. Foster and Keith then came back to Nashville and stayed at the Holiday Inn. Foster also stated she had to make a deposit of $1,400.00 in her bank account before Holiday Inn would rent her the room because her account was in the negative.

6

Case 3:23-cv-00157   Document 1-1   Filed 02/21/23   Page 6 of 8 PageID #: 10

21. Foster showed me a text thread where she appeared to speak with a "Dr. Strachan." The messages appeared dated, and none of the messages showed that Foster had any type of appointment.

22. Foster was asked about her ticket to Atlanta, Georgia. Foster stated her son had been shot, and she was unsure of his condition. Foster stated that if she could not get her surgery completed, she would then fly to Atlanta to see him.

***Seizure of United States Currency and Further Investigation***

23. TFO Moore then explained to Foster that the U.S. currency in her possession was being seized as suspected drug proceeds and explained the federal seizure process.

24. Further investigation revealed that Outlandish Trucking, LLC, is a registered entity as shown by information obtained from the Ohio Secretary of State website. Foster is listed as the Registrant Agent for Outlandish Trucking, LLC at 3251 Bentham Court South Columbus, OH 43219. This investigation has been unable to locate any information from the Department of Transportation as to the entity, Outlandish Trucking, LLC.

**E.     Conclusion**

25. Based on the foregoing, my experience and training, and the facts of this investigation, I believe the facts support a reasonable belief that the Defendant Property is monies furnished or intended to be furnished by any person in exchange for a controlled substance or proceeds traceable to such an exchange, or monies used or intended to be used to facilitate any violation of 21 U.S.C. § 801 *et seq.*, including 21 U.S.C. § 841 (illegal drug trafficking) and 21 U.S.C. § 846 (attempted drug trafficking).

26. The Defendant Property is therefore forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

7

Case 3:23-cv-00157   Document 1-1   Filed 02/21/23   Page 7 of 8 PageID #: 11

I declare under the penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
Special Agent, Walter W. Brightman
Drug Enforcement Administration

8

Case 3:23-cv-00157   Document 1-1   Filed 02/21/23   Page 8 of 8 PageID #: 12